IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


**TANNIE SHINE,**                                              Case 3:15 CV 1162

    Plaintiff,

    v.                                                             Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                            MEMORANDUM OPINION

### INTRODUCTION

Plaintiff Tannie Shine ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Defendant") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security insurance benefits ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and 1383(c)(3). The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(a). (Doc. 14). For the reasons below, the Court affirms the Commissioner's decision to deny benefits.

### PROCEDURAL BACKGROUND

On July 11, 2011, Plaintiff filed applications for and DIB and SSI, alleging a disability onset date of August 1, 2009. (Tr. 11, 273-74, 275-81). Plaintiff alleged disability due to lower back problems, left leg problems, bipolar disorder, high blood pressure, and high cholesterol. (Tr. 304). The state agency denied Plaintiff's applications initially on October 31, 2011, and upon reconsideration on February 22, 2012. (Tr. 11, 157-60, 161-63, 167-69, 174-76). Plaintiff

then timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 181). In November 2013, the ALJ held a hearing at which Plaintiff and a Vocational Expert ("VE") testified. (Tr. 11, 68-106). In January 2014, the ALJ found Plaintiff was not entitled to DIB or SSI. (Tr. 8-32). In April 2015, the Appeals Council denied Plaintiff's request for review, and the Commissioner's decision became final. (Tr. 1-3); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed the present action on June 10, 2015. (Doc. 1).

## FACTUAL BACKGROUND

*Personal & Vocational History*

Plaintiff was 54 years old on the alleged onset date of disability. (Tr. 300). Plaintiff completed eighth grade and has not obtained a GED. (Tr. 78). He worked previously as a factory worker, laundry worker, and prep cook. (Tr. 74, 80, 81, 97, 349-50, 376).

Plaintiff testified as to his mental functional limitations at the November 2013 hearing. (Tr. 76-91). He stated he lived alone but his cousin (who lived beneath him) helped him with cooking, cleaning, and drove him places. (Tr. 78, 82). He took care of his personal and hygiene needs. (Tr. 82). He said during a typical day he sat around and talked with his cousin, watched TV, and "maybe play[ed] a game of chess", although the game might be interrupted due to his concentration difficulties. (Tr. 82, 88). Plaintiff testified he heard voices once or twice per week, which interfered with what he was doing. (Tr. 88-89). He also stated he does not get along with people, and that he does not socialize like he used to. (Tr. 85, 89). Plaintiff was able to schedule and keep doctor's appointments, but once or twice per week would miss a television show he wanted to watch. (Tr. 89-90).

*Medical Evidence*[1]

*Consultative Physicians*

On September 14, 2011, Dr. Wayne Morse performed a psychological evaluation of Plaintiff at the request of the state agency. (Tr. 374). Plaintiff told Dr. Morse he was unable to work due to his physical and mental symptoms. (Tr. 374-77). Plaintiff reported he heard voices all the time, had nightmares and flashbacks on a daily basis, forgot important things, lost his train of thought easily, and had a very short attention span. *Id.* Plaintiff told Dr. Morse he had received counseling while incarcerated, but previously had no other formal treatment. (Tr. 376). With respect to his work history, Plaintiff reported he always had trouble with supervisors, could never stay focused at work, and was fired from several jobs. *Id.* Regarding his personal life, Plaintiff stated he had issues with anger; that "nobody can put up with me"; he did not have any hobbies or friends; was glad to be alive; went to Alcoholics Anonymous twice a week; and also went to church. (Tr. 377).

Dr. Morse noted Plaintiff was cooperative, made good eye contact, and was alert and oriented to person, place, and situation. (Tr. 377-78). He opined Plaintiff would have no issues with simple, routine tasks, but would have difficulty understanding and remembering detailed instructions. *Id.* He noted that although Plaintiff sought help for his chemical dependency, he did not express any need for mental health treatment at that time. (Tr. 379). Dr. Morse opined Plaintiff had fair judgment; had continued difficulty with his anger but not to any significant degree; was able to make sound, reasonable, and responsible decisions; had good social and self-awareness; and was able to plan for the future. *Id.* Based on the examination, Dr. Morse

---

1. Plaintiff alleged disability based on both mental and physical limitations (Tr. 304), however currently only challenges the ALJ's evaluation of his mental limitations. As such, the undersigned will only summarize the relevant medical records.

3

diagnosed Plaintiff with alcohol dependence (early full remission), cocaine dependence (early full emission), bipolar disorder, post-traumatic stress disorder (PTSD), panic disorder without agoraphobia, and assigned a Global Assessment of Functioning ("GAF") score of 49.[2] (374-81). He opined that there was evidence Plaintiff would have difficulty interacting appropriately with supervisors or co-workers, sustaining an ordinary routine, performing at a consistent pace, working in coordination with others and making simple work-related decisions. (Tr. 380-81).

Two years later, Dr. Thomas Evans evaluated Plaintiff at the request of the state agency. (Tr. 451). At this evaluation, Plaintiff told Dr. Evans that he got along "okay" with people in general, described his mood at that time as "pretty good" and his typical mood as "pretty good, but sometimes irritable." (Tr. 452-53). He stated that before starting medication, he was depressed on a daily basis, having auditory hallucinations, and was having nightmares and intrusive thoughts every night. (Tr. 453-54). After starting medication, he now had two to three good days out of seven, and his hallucinations and nightmares occurred "not too often". *Id.* Regarding his work history, Plaintiff stated he had no difficulties taking directives from supervisors; had frequent verbal altercations with coworkers, had good attendance; would sometimes "lash out" under workplace stress; but did not have any other past work difficulties due to his symptoms (Tr. 456).

Dr. Evans described Plaintiff as cooperative, friendly, and motivated. (Tr. 451, 455-56). He noted Plaintiff displayed good attention and concentration throughout the entire evaluation, maintaining focus without any difficulties. *Id*. Plaintiff answered all questions fully, his speech

---

2. A GAF score is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. A GAF score between 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)". Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th Ed. text rev. 2000 ("DSM-IV").

was understandable at all times, and he maintained good eye contact. *Id.* He further noted that Plaintiff was receiving psychiatric services including group therapy, and that the medication had helped him significantly with his depression, anxiety, and auditory hallucinations. *Id.* Plaintiff was assessed with a GAF score of 50.[3] (Tr. 454). Dr. Evans opined that Plaintiff could understand, remember, and carry out very simple instructions, could make judgments on simple work-related decisions, and should be limited to single-step tasks. (Tr. 455-56).

*Reviewing Physicians*

In September 2011, state agency psychologist Dr. Aracelis Rivera completed an assessment of Plaintiff's Residual Functional Capacity ("RFC"). (Tr. 124-27). Dr. Rivera opined Plaintiff had no significant limitations in his ability to understand, remember, and carry out instructions which were very short and simple, and had moderate limitations in his ability to understand, remember, and carry out detailed instructions. (Tr. 126). He also noted that Plaintiff could sustain simple tasks at a steady pace in a predictable work setting where a supervisor or coworker was available to occasionally explain tasks and re-direct, where changes were anticipated and explained, and where social interactions were brief and work-related. (Tr. 125-27).

On February 14, 2012, state agency psychologist Dr. Kristen Haskins reviewed Plaintiff's record of impairments and produced a similar RFC evaluation. (Tr. 138-40). Dr. Haskins opined Plaintiff could understand, remember, and carry out very short and simple instructions; could complete three to four step tasks; could work in a setting that did not need close sustained focus, attention, or fast pace, away from the distractions of others; was not well suited for work that entailed serving the public or resolving conflicts; and could function in a predictable work setting

---

3. *DSM-IV-TR*, *supra* note 2.

without stringent time or production requirements, where changes could be anticipated and easily explained. (Tr. 138-40).

*Other Medical Evidence Related to Mental Health*

From July 23, 2013 to August 2, 2013, Plaintiff was hospitalized at Firelands Regional Medical Center due to auditory hallucinations, for which he received antidepressant and antipsychotic medication. (Tr. 469-71). Summary treatment notes from this period describe his thinking as clear and less paranoid. (Tr. 470). During treatment, he became more social and more involved in activities. *Id.* He stated he felt like "everything is getting back to himself", and overall had a more positive attitude. *Id.* Upon discharge, notes describe him as calm, relaxed, appropriate, confident, and positive, and he denied delusion or hallucination. *Id.* Plaintiff was assessed with a GAF score between 40 and 50[4] and referred to counseling. (Tr. 471, 503).

On August 27, 2013, Plaintiff was subsequently assessed by counselors Ms. Annette Laird and Ms. Sue Cunningham of Firelands Counseling. (Tr. 501-03) It was noted Plaintiff still heard voices, and was depressed, but that medication was helping his mental health symptoms. (Tr. 501). Plaintiff reported he had a good relationship with his father and five children, and saw them all the time. *Id.* The counselor noted Plaintiff wanted things to get better, was internally motivated for treatment, cooperative, and had support of friends and his father. (Tr. 502). Plaintiff was diagnosed with schizophrenia, cocaine dependence (sustained full remission), nicotine dependence, and a GAF score of 45.[5] (Tr. 503).

**VE Testimony**

---

4. *DSM-IV-TR*, *supra* note 2. A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school. *Id.*
5. *DSM-IV-TR*, *supra* note 2.

6

At the November 2013 hearing, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, educational level, and work experience, with limitations to: unskilled work of all exertional levels; work involving three to four step tasks and only simple workplace decisions; an environment where changes were anticipated and easily explained, without stringent production or time requirements, without requirements of close sustained focus or attention, or a sustained fast pace; work away from the distractions of others; and only brief superficial interactions with co-workers, supervisors, and the public. (Tr. 99-100). The VE testified that with those restrictions, such a person could not perform Plaintiff's past work. (Tr. 100). However, the VE identified other jobs in the national economy, including laundry laborer, transportation cleaner, or hospital cleaner. (Tr. 101).

The ALJ then added restrictions requiring the individual to avoid all workplace hazards and vibrations, limit lifting and carrying exertion to the medium level, and sit four hours, stand two hours, and walk two hours. (Tr. 102). The VE testified that the individual could not perform Plaintiff's past relevant work with the restrictions, but did not address whether other jobs would be available. (Tr. 102-03). Plaintiff's attorney asked how moderate limitations in the hypothetical individual's ability to interact appropriately with supervisors and co-workers would affect the VE's answer. (Tr. 105). The VE stated that it would have no impact on his prior testimony. *Id.*

*ALJ Decision*

In January 2014, the ALJ found Plaintiff had the following severe impairments: schizophrenia, paranoid type; major depression; post-traumatic stress disorder; panic disorder without agoraphobia, alcohol dependence in remission; cocaine dependence in remission; and bipolar disorder; but these impairments did not meet or medically equal the severity of any listed impairments. (Tr. 14-17). The ALJ then found Plaintiff had the RFC to perform a full range of

7

work at all exertional levels, but limited to simple, routine tasks with unskilled work where changes were anticipated and easily explained, with no stringent production or time requirements, in an environment that did not require close sustained focus or attention or sustained fast pace where work was away from the distractions of others. (Tr. 19). Furthermore, Plaintiff was restricted to brief, superficial interactions with supervisors, co-workers, and the public, and was able to make simple work-related decisions. (Tr. 19-20). Based on the VE testimony, the ALJ found Plaintiff could work as a laundry laborer, transportation cleaner, and hospital cleaner, and thus was not disabled. (Tr. 26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record". *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe", which is defined as one which substantially limits an individual's ability to perform basic work activities?

2. Does the severe impairment meet one of the listed impairments?

4. What is the claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters,* 127 F.3d at 529.

## DISCUSSION

Plaintiff argues that the ALJ's decision was not supported by substantial evidence

9

because she failed to: 1) properly evaluate Plaintiff's credibility as to his limitations; 2) adopt limitations expressed by Dr. Morse and Dr. Evans; 3) give appropriate weight to the opinion of counselors Ms. Laird and Ms. Cunningham; and 4) properly evaluate Plaintiff's GAF scores. Defendant responds that the decision was supported by substantial evidence. Each assignment of error will be addressed in turn.

*Plaintiff's Credibility*

In his the first part of his assignment of error, Plaintiff argues the ALJ improperly discredited his testimony as to the severity of his mental functional limitations. (Doc. 16, at 10-11). Defendant responds that the ALJ's determination is supported by substantial evidence. (Doc. 19, at 6). For the reasons below, the undersigned agrees with Defendant.

The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints based on a consideration of the entire case record. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Discounting credibility to a certain degree is appropriate when the ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *Walters*, 127 F.3d at 531. The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

The ALJ found that Plaintiff's testimony about his mental functioning limitations was not fully credible, since it was not well supported by medical evidence of record. (Tr. 24). The ALJ

10

cited specific instances where Plaintiff's testimony was inconsistent with previous reports to medical sources about the severity of his impairments. *Id.* Plaintiff testified he did not talk to many people, enjoy attending family functions, or socialize like he used to. (Tr. 89). However, he attended church, was close to siblings and his children, had a friend for emotional support, and played chess with other friends. (Tr. 82, 88, 377, 453, 483-84). He testified that he missed television shows that he had wanted to watch once or twice a week, and only finished what he had started forty percent of the time. (Tr. 90-91). However, he also kept doctor's appointments he scheduled, and reported that he watched sports and game shows on television daily. (Tr. 90, 335). Furthermore, he did not report any changes in his daily activities due to lack of concentration, and said he was actually watching more television because of his symptoms. (Tr. 326). Accordingly, the ALJ determined that Plaintiff's testimony about his symptoms and limitations was only partially credible, since it was not fully supported by the record. (Tr. 24). The ALJ's evaluation of Plaintiff's records and testimony is reasonable and supported by substantial evidence, and therefore must be given deference. *Jones*, 336 F.3d at 476.

### *The ALJ's Evaluation of Medical Opinions*

Plaintiff next assignment of error concerns the consultative examiners Dr. Morse and Dr. Evans. First, he alleges the ALJ improperly evaluated and weighed the medical opinion of Dr. Morse; and second, the ALJ should have adopted the "single-step" limitation expressed by Dr. Evans. (Doc. 16, at 11-12). Defendant responds that neither examiner was not entitled to controlling or significant weight, and that the ALJ's assessments were reasonably founded on the available record evidence. (Doc. 19, at 7). For the reasons below, the undersigned finds that Dr. Morse's opinion was properly weighed in light of its inconsistencies with record evidence, and that the ALJ properly adopted those functional limitations from Dr. Evans' report which were

11

supported by substantial evidence.

Consultative examiners are considered non-treating sources, because they are physicians who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with him. 20 C.F.R. § 416.902. Therefore, their opinions must be weighed but are not given deference. 20 C.F.R. § 416.927(d)(2); SSR 96-8p. In weighing the opinion of a non-treating source, the ALJ must determine the weight to give the medical opinion based on certain factors. 20 C.F.R. § 404.1527(d). The factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2))

*Dr. Morse*

The ALJ gave Dr. Morse's opinion partial weight because he found it inconsistent with the record as a whole. (Tr. 21). Dr. Morse relied primarily on Plaintiff's reports as to his daily activities, with some objective tests during the mental status exam. The contention that Plaintiff's testimony supported and was supported by Dr. Morse's opinion is of little merit, since the testimony was inconsistent with the record in all the same ways as Dr. Morse's opinion.

As to his difficulties concentrating, Plaintiff reported that he frequently misplaced important items, had a very short attention span, lost interest in things almost immediately, could never stay focused at work, started things and often failed to complete them, missed parts of conversations, and lost his train of thought easily. (Tr. 374-77). Two years later, when Dr. Evans asked about difficulties posed by his mental symptoms, there was not a single reference to poor concentration or memory loss, with Plaintiff simply listing his symptoms as depression, anxiety,

12

and lack of motivation. (Tr. 453). In fact, Dr. Evans opined that Plaintiff was able to maintain focus without difficulties, and had good attention and concentration throughout the evaluation. (Tr. 455).

Regarding his social difficulties, Plaintiff reported to Dr. Morse that nobody could put up with him, he always had trouble with supervisors, sometimes lost control of his anger at work, sometimes even threw things due to his anger, and had no hobbies or friends. (Tr. 374-77). Two years later, Plaintiff reported to Dr. Evans that he had no difficulties taking directives or getting along with from supervisors, was attending intensive counseling three times a week, had a friend come by to cook and assist with grocery shopping, and had no problems with authority figures. (Tr. 452-53, 455-56). Furthermore, Dr. Evans opined that Plaintiff was cooperative and friendly throughout the entire interview, and he was able to establish and maintain a rapport easily. (Tr. 451, 455). When discussing his social life with Ms. Laird and Ms. Cunningham, Plaintiff also stated that he had a good relationship with his nine children and saw them all the time, had support from his father, and had a good friend to rely upon. (Tr. 501-02). The counselors described Plaintiff as cooperative. *Id.*

Additionally, Plaintiff reported to Dr. Morse that had significant problems with auditory hallucinations, heard voices all the time, and had nightmares and flashbacks on a daily basis. (Tr. 374, 377). Two years later, he did not list auditory hallucinations among his primary symptoms, told Dr. Evans his nightmares and hallucinations did not happen often, and that he was sleeping well. (Tr. 453-54). Less than two weeks later, Plaintiff told the Firelands counselors that he was hearing voices, and had sleep problems. (Tr. 502). The counselors opined that his medications were helping him with these issues. *Id.*

As the ALJ concluded, the record as a whole did support some of the limitations posed in

13

Dr. Morse's opinion, although not to the extent that Plaintiff's inconsistent testimony would allege. (Tr. 21-22). Dr. Morse opined that Plaintiff may have intelligence at the "borderline" level,[6] and Plaintiff performed poorly on the objective memory and cognitive function tests administered. (Tr. 378-79). However, Dr. Morse noted Plaintiff had fair judgment, good social and self-awareness, and was able to plan for the future. *Id.* Accordingly, the ALJ integrated the limitations that Plaintiff be restricted to unskilled work with only superficial interactions in a static environment, based on Dr. Morse's opinion that Plaintiff would be able to understand and remember simple instructions, and further supported by Plaintiff's lack of treatment for his mental impairments at that time. *Id.* The undersigned finds that the ALJ reasonably gave Dr. Morse's opinion the weight it was due after a neutral comparison with medical record evidence.

*Dr. Evans' Opinion*

Plaintiff further argues the ALJ erred by omitting a limitation, opined by Dr. Evans, that Plaintiff should be limited to single step tasks. (Doc. 16, at 12). Defendant argues the ALJ's RFC determination reasonably incorporated many of Dr. Evans' limitations and is supported by substantial evidence. (Doc. 19, at 7).

Again, since Dr. Evans was not a treating physician, Dr. Evans' recommendations, including mental functional limitations, do not have controlling weight. 20 C.F.R. § 416.927(d)(2). Appropriately, the ALJ weighed the opinion against the record and found that certain limitations were supported with respect to Plaintiff's understanding, remembering and carrying out simple instructions and making judgments on simple work-related decisions. *Id.* First, notes from Dr. Morse, Dr. Evans, and the state agency reviewing psychologists

---

6. "Borderline intelligence" refers to individuals with IQ scores above 69, but below the average level of intellectual functioning. Thus, individuals with "borderline intelligence" have IQ scores bordering on average intelligence. *See* DSM-IV, at 48.

consistently establish that Plaintiff would have no significant limitations in understanding, remembering, and carrying out very short and simple instructions. (Tr. 125-27, 138-40, 377-78, 455-56). The ALJ's decision to omit the "single-step tasks" limitation and instead limit Plaintiff to "3-4 step tasks" is reasonable in light of the fact that none of the other medical evidence supports the more severe restriction. Although Dr. Morse opined Plaintiff may have borderline intelligence, equivalent to Dr. Evans below-average intelligence opinion, Dr. Morse did not pose a similar "single-step tasks" limitation. (Tr. 380, 455). Second, the ALJ noted Plaintiff was able to undertake a range of simple activities of daily living, including playing chess and cards with others. (Tr. 453, 483-84, 502). Rather than "cherry-picking", this neutral comparison of record evidence to medical opinion is well within the "zone of choice" that the ALJ possesses in rendering disability decisions. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009).

***Opinions of "Other Sources"***

Plaintiff also suggests that the ALJ did not properly assess the information provided by counselors Ms. Laird and Ms. Cunningham about the severity of his impairments. (Doc. 16, at 12). He does not indicate what, if any, limitations were affected by the ALJ's finding. Defendant contends the ALJ fulfilled her legal duty to consider all relevant evidence in the case record. For the reasons below, the undersigned finds that the ALJ performed a legally acceptable review of the counselors' report by finding it consistent with the record.

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502; 416.902. An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)-(2). Evidence from those who

15

are "not acceptable medical sources" or "other sources", including nurse practitioners, "are important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03, 2006 WL 2329939, at *2. Interpreting SSR 06-03, the Sixth Circuit found that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

The ALJ initially noted that as counselors, they were not due the same deference as an "acceptable medical source" such as a psychologist or physician. (Tr. 22). Thus, the ALJ followed § 404.1513(e) and discussed the relevant portions of their opinion in which they provided insight into the severity of Plaintiff's impairments and their effects on his ability to function. *Id.* First, the counselors noted Plaintiff was internally motivated for treatment, cooperative, had support of friends and his father, and desired things to improve. (Tr. 502). These comments are consistent with evidence Plaintiff was not severely limited in his daily social activities, as evidenced by his consistently eager cooperation with medical professionals (Tr. 377, 452), reliance on others for support (Tr. 374, 452-53), and overall positive family life (Tr. 375, 452).

The counselors also assessed Plaintiff with a GAF score of 45, similar to the GAF scores of 49 and 50 given by Dr. Morse and Dr. Evans. *Id.* The Court will directly address the GAF results in the following section, but suffice it to say that GAF scores have "no direct correlation to the severity requirements of the mental disorders listings." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 417 (6th Cir 2006) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5

16

(11th Cir. 2005). The ALJ's assessment that the counselors' opinions were consistent with the other record evidence is in accordance with proper procedural guidelines and supported by substantial evidence.

*Plaintiff's GAF Scores*

Finally, Plaintiff argues the ALJ improperly gave his GAF scores limited weight when assessing the RFC. Plaintiff further cites the consistent GAF scores from Dr. Morse, Dr. Evans, and the Firelands counselors as evidence that "even with treatment and medication, [Plaintiff] has been found to have serious symptoms by all treating and examining sources." (Doc. 16, at 12). Defendant argues the ALJ's evaluation was appropriate given the GAF scores' limited value as evidence. (Doc. 19, at 8). For the reasons below, the undersigned finds the ALJ's evaluation was supported by substantial evidence.

As the ALJ correctly noted, GAF scores are not dispositive in the Social Security Administration's evaluation of psychological limitations and do not prove Plaintiff had an ongoing disability. (Tr. 23). "While a GAF score is of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). The scale does not have a "direct correlation to the severity requirements in our mental disorder listings". *DeBoard,* 211 F. App'x at 415 (quoting *Wind*, 133 F. App'x at 692 n.5.)

Even though the relevant range of GAF scores indicates "serious symptoms", the ALJ correctly evaluated them as having limited weight in the RFC since they are not definitive proof of any ongoing disability which would preclude Plaintiff from working at least some jobs in the national economy. (Tr. 23; *see also* 20 C.F.R § 403.1513). As the ALJ noted, the scores lower than 45 were assessed during the period when Plaintiff was hospitalized for his auditory

17

hallucinations. (Tr. 469-71). Plaintiff subsequently began counseling, and started a regimen of antipsychotic medication. *Id.* Both Dr. Evans and the Firelands counselors opined Plaintiff had benefited from this treatment, since he had no evidence of psychosis, had seen reductions in his nightmares and intrusive thoughts, and generally was sleeping better. (Tr. 453-55, 501-03). The ALJ was justified in giving scores assessed during decompensation less weight, since they were not consistent with the higher GAF scores which reflected the ongoing benefit Plaintiff had received from counseling and medical treatment. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("If other substantial evidence (such as the extent of claimant's daily activities) supports the conclusion that [Claimant] is not disabled, the court may not disturb the denial of benefits to a claimant whose score is as low as [41-50] or even lower"). The ALJ's decision to give Plaintiff's GAF scores limited weight is thus supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits supported by substantial evidence, and therefore the Commissioner's decision is affirmed.

s/James R. Knepp, II
United States Magistrate Judge